**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| CECELIA ROBERTS WEBB, | ) | |
| DARRON YATES, ROBERT EUTZ, | ) | |
| ANTHONY LEMICY, KRYSTAL BANKS, | ) | |
| and FRANK WILLIAMS, individually and on | ) | |
| behalf of all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:16-cv-1703 |
| | ) | |
| THE CITY OF MAPLEWOOD, MISSOURI, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

**CLASS ACTION COMPLAINT**

**Introduction**

1.      Out of a desire to profit off of individuals subject to arrest solely for failing to pay minor municipal fines or failing to appear in its municipal court, the City of Maplewood devised and implements daily an unlawful pay-to-play system. By using "warrant recall bonds," which function as a pay wall, Maplewood bars citizens' access to the courts, disproportionately impacting poor and black residents frequently commuting through Maplewood's major thoroughfares between home, work and school, and squeezing funds from individuals who can least afford the expense. The system, ratified and promulgated by Maplewood's city officials at various levels, violates the First, Fourth, Sixth and Fourteenth Amendments to the United States Constitution.

2.      The six named Plaintiffs—Cecelia Roberts (Webb), Darron Yates, Robert Eutz, Anthony Lemicy, Krystal Banks, and Frank Williams—bring this class action lawsuit against the City of Maplewood for vindication of their own constitutional rights and the rights of thousands

of other similarly situated individuals, all of whom have been subjected to the unconstitutional warrant procedures described herein.

3.      Plaintiffs are a group of similarly situated individuals who are victims of the Defendant City of Maplewood's extortionate scheme, in which Maplewood police perform unlawful seizures to ensnare individuals in the Maplewood municipal court machine. The court, in turn, issues arrest warrants with insurmountable warrant bond fees against individuals who are unable to satisfy a scheduled court payment or appearance, thereby effectively locking the courthouse doors to individuals who cannot afford to pay. Maplewood's policies and procedures achieve this result by providing those individuals with a Hobson's choice to recall an arrest warrant: (1) sit in jail; or (2) spend money to either (a) pay the entire warrant bond fee, a sum which may typically range from $300 to $500, or (b) to hire an attorney to attempt to advocate on their behalf.

4.      Until an individual satisfies one of those options, the warrant looms overhead in perpetuity. Meanwhile, Maplewood systematically denies the individual their constitutional right to access the courts to gain any information about their case or charges, or to certify the case to a higher court.

5.      Maplewood's officials and employees—through their conduct, decisions, training, rules, policies, practices, and procedures—constructed and implemented this scheme for the improper purpose of imposing punitive measures not permitted by the United States Constitution upon those charged with municipal offenses, and as a mechanism of unlawful discrimination and abuse against a population of poor, disproportionately African-American individuals.

6.      Thousands of people in the Plaintiffs' position must divert funds from their disability checks, or sacrifice meager earnings their families desperately need for food, diapers,

clothing, rent, and utilities, to pay "warrant recall bonds" and other costs demanded by the City to gain access to Maplewood's court or avoid imprisonment. Such individuals, including Plaintiffs, have suffered arrest and jail time when they cannot afford to pay, deepening their poverty.

7. The system of warrants, arrests and imprisonment Maplewood imposes through its municipal court frightens away from the courthouse those unable to pay the bond demand, who would otherwise be entitled to seek relief in the form of a lowered bond. The system creates perverse incentives for the City to maximally profit off the poor while simultaneously discouraging participation by arrestees, contradicting the City's purported intent of encouraging those same arrestees to attend calendared court appearances through the financial obligation of a bond.

8. Furthermore, Maplewood's "warrant recall bond" policy and procedure denies individuals access to the courts until they either pay the enormous warrant recall "bond," or spend 48 hours in jail. Maplewood's policy and procedure is to deny warrant-status individuals (a) access to information about underlying charges; (b) a new court date; (c) an opportunity to seek a judicial determination on their ability to pay the warrant recall bond itself; and/or (d) an opportunity to file any other motions, including motions to certify the municipal charges to a higher associate circuit court for impartial determination.

9. The treatment of the named Plaintiffs reveals an intentional, systemic effort by Defendant Maplewood through both police and municipal court practices, to deprive some of the area's poorest residents of their rights under the United States Constitution. For years, Defendant has engaged in the same conduct, as a matter of policy and practice, against Plaintiffs and thousands of other impoverished citizens. These citizens' fundamental constitutional rights to

liberty and access to the courts, however, cannot depend on personal income. Such flagrant abuse is not consistent with this country's values, with the rule of law, nor with the constitutional guarantees of Equal Protection and Due Process.

## Nature of the Action

10. Defendant Maplewood's policy and practice related to "warrant recall fees" or "warrant bonds" triggered by Failure to Appear and Failure to Pay charges directly prevents people from appearing in court until the fee is paid or until they serve the arbitrary 48-hour stint in jail.

11. Pursuant to policy and practice, Defendant jails indigent people who are unable to pay these sums without informing them of their right to counsel and without providing counsel for those who cannot afford it.

12. Pursuant to policy and practice, Defendant Maplewood issues and enforces invalid arrest warrants, threatens alleged debtors with jail if they do not bring cash to court, holds alleged debtors in jail for days without due process, sets and modifies monetary payments necessary for release with no regard for ability to pay or basic fairness.

13. Then, pursuant to policy and practice, Defendant Maplewood denies individuals access to the courts by withholding case information, refusing to issue new court dates, refusing to consider motions raised by individuals, and refusing to certify warrant-status municipal cases up to the St. Louis County Associate Circuit Court. Defendant Maplewood's policy and practice leaves individuals with the choice of either paying the entire bond amount or sitting in jail, which has the effect of frightening people away from appearing in court while fining them for not appearing, all in violation of the United States Constitution.

14. The Plaintiffs seek declaratory, injunctive, and compensatory relief.

**Jurisdiction and Venue**

15.     This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2201, *et seq.*, and the First, Fourth, Sixth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

16.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

**Parties**

17.     Plaintiff Cecelia Roberts (a/k/a Cecelia Webb) is a resident of St. Louis City, Missouri.

18.     Plaintiff Darron Yates is a resident of University City in St. Louis County, Missouri.

19.     Plaintiff Robert Eutz is a resident of St. Louis City, Missouri.

20.     Plaintiff Anthony Lemicy is a resident of St. Louis City, Missouri.

21.     Plaintiff Krystal A. Banks is a resident of St. Louis City, Missouri.

22.     Plaintiff Frank Williams is a resident of the City of Maplewood in St. Louis County, Missouri.

23.     Defendant City of Maplewood is a municipal corporation organized under the laws of the State of Missouri. The City of Maplewood operates the Maplewood Municipal Court and Maplewood Police Department, and contracts and/or conspires with other municipalities in the St. Louis region to fine and imprison individuals for violations of Maplewood City Ordinances.

**FACTUAL ALLEGATIONS**

A.     **Maplewood's Racially and Economically Stratified Geography Leads to Disproportionate Traffic Enforcement Against Poorer Black Motorists.**

24.     Maplewood is a predominantly white, middle-class city of nearly 8,000 people

that is able to rely on a substantial tax base to fund a variety of municipal services. However, Maplewood's practice of raising money through traffic tickets, municipal court fines, and bond fees from people passing through its boundaries is the latest permutation of a very old model developed to maintain a system of racial and class exclusion, and a mechanism to extort payment from vulnerable targets.[1]

25.     The City of Maplewood is a municipal town within St. Louis County, Missouri, that abuts the western border of the City of St. Louis. Several major thoroughfares bisect Maplewood, where its police freely dole out tickets to motorists passing through and within the city on interstates, state highways, four-lane city boulevards, and small neighborhood streets.

26.     In the early 1900s, the City of St. Louis became the first city to pass by popular ballot a local ordinance mandating that blacks and whites live on separate, designated blocks. After that practice was ruled unconstitutional in *Buchanan v. Warley,* 245 U.S. 60 (1917), racial segregation was enforced through restrictive covenants, until those, too, were ruled unconstitutional in *Shelley v. Kraemer*, 334 U.S. 1 (1948). The proliferation of micro cities and municipalities across St. Louis county was a scheme cut from the same cloth—municipalities were able to use zoning ordinances and residency requirements to exclude blacks that hoped to "intrude" upon white neighborhoods.

27.     As a result of these inequitable racial and economic divides, wealthier, whiter

---

[1] Maplewood's population in 2014 neared 8,000 people who are predominantly white, middle-class families, with only 17.20% of its population is black and 20.80% of its population earning below the poverty line. *See Judicial Report Supp.: Fiscal Year 2014*, OFFICE OF STATE COURTS ADMIN.MO., Table 94, http://www.courts.mo.gov/file.jsp?id=83262; *General Administration #2*, BETTER TOGETHER ST. LOUIS at 8-12 (December 2015), http://www.bettertogetherstl.com/wp-content/uploads/2015/12/Better-Together-General-Administration-Report-2-FINAL-.pdf; U.S. CENSUS BUREAU, PROFILE OF GENERAL POPULATION AND HOUSING DATA (2010); U.S. CENSUS BUREAU, 2010-2014 AMERICAN COMMUNITY SURVEY 5-YEAR ESTIMATES: SELECTED ECONOMIC CHARACTERISTICS (2014).

municipalities like Maplewood and its neighbors are home to big box stores, chain restaurants, and other minimum-wage employment opportunities not found in the poorer municipalities to the north or within St. Louis City to the east. The divide compels Plaintiffs and the purported class members to work in and travel through the wealthier cities, like Maplewood and its neighbors, cities in which they largely cannot afford to live.

28. Specifically, motorists from St. Louis City traveling west along Interstate 44 and State Highway 100 (also called "Manchester Road") must pass through Maplewood, while many North County residents necessarily traverse south via the four-lane Big Bend Boulevard across some of the wealthiest municipalities, including Maplewood, along their daily commute.

29. Essentially, Maplewood's geographical location provides it opportunity to catch, release, and re-catch motorists—like fish trapped in an overstocked pond—all to increase its revenue with traffic fines, court costs, money bail payments, and warrant recall fees at a steady rate.

**B.** **Maplewood's Flawed and Unlawful Warrant Process Disproportionately Targets Black Motorists, Whether Residents of Maplewood or Not.**

30. Pursuant to policy and practice, Defendant applies uniform illegal policies to issue and enforce arrest warrants for those unable to satisfy Defendant's extortionate demands.

31. Based on data reported by police departments to the Missouri Attorney General, Black residents living in and traveling through Maplewood are much more likely to be searched and/or arrested as a result of a vehicle stop than other racial groups, particularly whites. For example, in 2015, out of 3,327 total vehicle stops in Maplewood, 3.74% of stops involving white individuals resulted in a search, while the proportion of black stops resulting in a search was *more than double* that rate, at 8.61%. Even though contraband is equally-likely to be discovered during stops involving both white drivers and black drivers, black drivers are nearly *three times*

more likely to be arrested than white drivers under Maplewood's scheme. [2]

32.     Defendant issues arrest warrants for failure to make a payment of the underlying fine by a certain date ("Failure to Pay") without inquiring as to whether the person has the ability to make a payment. Defendant preys on the unrepresented, refusing to withdraw arrest warrants even for those who are plainly too poor to make payments.

33.     Defendant also routinely issues arrest warrants for "Failure to Appear" at court dates without giving people adequate notice of the supposed obligation to appear, such as when Defendant fails to serve a valid summons or when the Defendant reschedules a hearing without providing reasonable notice.

34.     The arrest warrants that Defendant issues for "Failure to Pay" and "Failure to Appear" at court dates are automatically generated by a computer program, based on information that the municipal court clerks enter manually into the computer system. On information and belief, no judge or magistrate approves these warrants before they are issued.

35.     After arresting a person based on an automatically generated warrant, Defendant routinely demands that the arrestee make immediate payment and, if she does not, Defendant holds the arrestee in jail and unnecessarily delays presentment in court for days or weeks in an effort to coerce the victim to pay for her freedom, regardless of her indigence. Without affording any legal process, Defendant also tacks on a "warrant" fee for the person's missed payment date. The person is not arraigned on any new charge for "Failure to Pay" or "Failure to Appear" before Defendant imposes the additional "warrant" fee, nor does Defendant allow the person a meaningful opportunity to defend against the charge, or show that Defendant has not satisfied its

---

[2] MISSOURI ATTORNEY GENERAL VEHICLE STOPS REPORT, *available at* https://ago.mo.gov/home/vehicle-stops-report/advanced-search.

elements.[3] Again, Defendant appoints no attorney to assist the person on any new charge.

Defendant simply adds the charges to the person's debts.

### i. Maplewood Fails to Follow Its Own Rules of Procedure or the Missouri Rules of Civil Procedure When Charging Bonds and Warrant Recall Fees.

36.     Defendant Maplewood employs policies and practices that not only violate its

own municipal codes, but also violate the Missouri Rules of Civil Procedure with regard to

issuance of "Failure to Appear" charges.

37.     Maplewood charges individuals who miss a court date or fail to submit payment

to the court on time with "Failure to Appear," and automatically issues a warrant for their arrest.

These warrants are regularly sought, issued, and served without any finding of probable cause

that the person has committed the elements of any offense.

38.     The "Failure to Appear" ordinance in Maplewood contains an intent element,

which necessarily requires some inquiry into the mind of the accused and affords individuals an

immediately available defense against the charge:

> MAPLEWOOD MUNI. CODE Ch. 34 Art. I § 34-13: Any person who having
> been released upon a recognizance bond ***willfully*** fails to appear in the
> municipal court as required, shall be guilty of a misdemeanor and punished
> . . . . (emphasis added)

39.     Defendant chooses to pursue warrants instead of issuing summonses even when it

has spoken to accused individuals by telephone or in person, and has ample opportunity to notify

the individual of their obligation to appear in court. The city at no time affords the accused a

---

[3] The practice of adding on illegal warrant recall fees is widespread throughout the region. Counsel for Plaintiffs has sued several municipalities in state court for imposing these fees. *See White* v. *City of Pine Lawn*, 14SL-CC04194 (St. Louis County Circuit Court, Dec. 2014); *Pruitt v. City of Wellston*, 14SL-CC04192 (St. Louis Co. Cir. Ct., Dec. 2014); *Lampkin v. City of Jennings*, 14SL-CC04207 (St. Louis Co. Cir. Ct., Dec. 2014); *Wann v. City of St. Louis*, 1422-CC10272 (St. Louis City Cir. Ct., Dec. 2014); *Reed v. City of Ferguson*, 14SL-CC04195 (St. Louis Co. Cir. Ct., Dec. 2014); *Eldridge v. City of St. John*, 15SL-00456 (St. Louis Co. Cir. Ct., Feb. 2015); *Watkins v. City of Florissant*, 16SL-CC00165 (St. Louis Co. Cir. Ct., Jan. 2016).

chance to defend himself against the "Failure to Appear" charge.

40.     Under these circumstances, persons accused of "Failure to Appear" in Maplewood are automatically presumed guilty of this violation and charged a "warrant recall fee," but are unable to defend themselves against the "Failure to Appear" charge or the warrant recall fee itself unless they first pay the full warrant recall fee. At that point, the accused then must ask the very judge who issued the guilty "Failure to Appear" conviction to admit it was entered unlawfully and overturn it.

41.     Maplewood further operates its "Failure to Appear" machine pursuant to policies and procedures that almost certainly violate the notice requirements set forth in the Missouri Rules of Civil Procedure for convictions issued upon automatic presumptions of guilt.

42.     In Missouri, a prosecutor must prosecute ordinance violations pursuant to issuance of an "information" statement. *See* Mo. R. Civ. P. §§ 37.34–37.41. However, the "information" statement must be supported by a document called a "Violation Notice." *See* Rule 37.34. Pursuant to Missouri Rules, a municipality like Maplewood must issue a "Violation Notice" to every person accused of any crime. To wit, subsection (b) of Rule 37.33 states:

> When a violation has been designated by the court to be within the authority of a violation bureau pursuant to Rule 37.49, the accused *shall also be provided* the following information:
>
> (1)  The specified fine and costs for the violation; and
> (2)  That a person must respond to the violation notice by:
>
>> (A) Paying the specified fine and court costs; or
>> (B) *Pleading not guilty and appearing at trial.*

Mo. R. Civ. P. 37.33(b) (emphasis added).

43.     This requirement for Violation Notice is particularly important in the context of the Defendant Maplewood's policies and procedures whereby the Defendant operates on a

presumption of guilt without affording the accused an opportunity to rebut that presumption.

44.     On information and belief, pursuant to its policies and procedures, Defendant Maplewood does not send such notices as required under Rule 37.33(b). Such failure serves as yet another blatant denial of court access and due process for poor persons accused of "Failure to Appear" charges.

45.     Although parsing municipal ordinances and state rules of civil procedure may not seem important to Defendant Maplewood, the aggregate effect of Maplewood's careless disregard for their own municipal ordinances and their inevitable failure to follow Missouri rules requiring the issue of proper Violation Notices is daunting: on information and belief, nearly every "Failure to Appear" conviction and subsequent fine assessment and collection executed by Defendant Maplewood is voidable because either (1) it was achieved without any inquiry into the intent of the accused; or (2) Defendant Maplewood failed to provide the accused with proper Violation Notices informing the accused of the nature, costs, and rights to contest each "Failure to Appear" charge.

46.     As a result, on information and belief, Defendant Maplewood's "Failure to Appear" convictions—and fees collected therefrom—are void for lack of proper due process under Missouri state law.[4]

**C.     Maplewood's "Warrant Recall Fee" or "Warrant Bond" Denies Access to Courts**

47.     Defendant Maplewood systematically deprives the First Amendment rights of poor individuals, including Plaintiffs, by operating a system pursuant to its established policies and procedures, which inextricably ties an individual's ability to pay a "warrant recall fee" (or other monetary fee associated with "Failure to Pay" warrants or "Failure to Appear" warrants) to

---

[4] *See* Mo. S. Ct. R. 74.06(b)(4).

that individual's ability to access Defendant's courtroom, court files, and the information and proceedings contained therein.

48.     Once Maplewood issues an arrest warrant for Failure to Appear or Failure to Pay charges, it levies an insurmountable "warrant recall fee" or "warrant bond fee" against individuals who are unable to satisfy a scheduled court payment or appearance. This warrant bond creates a "pay-to-play" structure that essentially locks the courthouse doors to individuals who cannot afford to pay for access, but unlocks and opens them for individuals who can either pay the bond amount or pay a lawyer to attempt to achieve the unlikely result of getting the warrant recalled.

49.     The warrant stands until the individual satisfies one of those options, while Maplewood systematically denies individuals their constitutional right to access the courts by (a) refusing to provide information about the underlying municipal charges; (b) refusing to schedule new court dates; (c) denying individuals any opportunity to challenge the bond amount or quash the warrant itself, no matter their personal or financial circumstance; (d) refusing all requests to certify warrant-status municipal cases to a higher county associate circuit court, thus ignoring and violating state and local court rules; and (e) arresting and jailing individuals brave enough to physically walk into the Maplewood courthouse with empty pockets to challenge the warrants and bonds.

50.     Defendant's policies and procedures deprive the First Amendment rights of the Plaintiffs and others similarly situated to access the courts.

51.     The fear fostered by Defendant Maplewood has further degraded the quality of life of the poorest residents in the St. Louis metropolitan area. Many have cut back on food, clothing, utilities, sanitary home repairs, and other basic necessities of life to satisfy, or try to

satisfy, Defendant's rapacious demands for money.

52.     People who have faced charges in the Maplewood municipal court have observed the following practices:

a.  Maplewood officials refused to recall a warrant unless the individual paid the cash bond amount in full;

b.  Maplewood officials told individuals over the telephone that arrangements for partial payments are not permitted;

c.  Maplewood refused to conduct a determination as to whether an individual could afford her $500 bond;

d.  Maplewood refused to schedule a new court appearance or bond hearing when requested by an individual until the bond was fully paid;

e.  Maplewood refused an individuals' request to certify the case to St. Louis County Circuit Court by writing "Denied. Def. in Warrant Status" on the face of her motion;

f.  One Maplewood judge responded to an individual's motion for bond reduction in open court by stating "I believe people need to be punished for failing to appear in court" and that "the bond remains at $500";

g.  One individual was told by Maplewood officials on the telephone that Maplewood's policy provided only two ways to get a warrant recalled: (1) pay his entire $400 bond; or (2) turn himself in at the Maplewood Court and sit in jail for 48 hours;

h.  When the individual contacted the Maplewood Assistant City Manager to seek additional help resolving the warrant, the Assistant City Manager said the individual would likely be arrested if he showed up to the Maplewood courthouse on that day without the $400 bond money; and

i.  One Maplewood judge told an individual the only reason he would waive the bond fee was because the individual had "found himself a persistent lawyer."

**D.    The Named Plaintiffs' Struggles to Gain Access to Maplewood Court**

**i.      Cecelia Roberts (Webb)**

53.     Cecelia Roberts (a.k.a. Cecelia Webb) is a 26-year-old African-American mother who lives with her husband and minor daughter in St. Louis City, Missouri. Ms. Webb presently works part time for a nonprofit organization earning $8 per hour, and her husband works as a server at a local restaurant. Even with their combined incomes, Ms. Webb and Mr. Webb struggle to earn enough money to pay the normal costs of living, and they cannot afford health insurance for their family.

54.     In September 2015, Ms. Webb was hired to work a night shift at a Wal-Mart in Maplewood, Missouri. There, Ms. Webb's exemplary work ethic earned her a promotion and a raise, and placed her on a fast-track to become an assistant manager. Along with the promotion, Ms. Webb received full-time benefits including health insurance for her entire family, life insurance, and a retirement plan.

55.     Each night, Ms. Webb drove the family vehicle to work by 10:00 p.m. Each night, Ms. Webb liked to call home to her husband upon arriving at the Wal-Mart store to assure him she had arrived safely at work.

56.     On one particular evening in April 2016, Ms. Webb drove the family vehicle to the Maplewood Wal-Mart, where she safely parked her vehicle in the same spot in which she parked every night she worked, arriving a few minutes early for her 10:00 p.m. night shift.

57.     Ms. Webb exited her vehicle and reached for her cell phone inside her purse to call her husband and tell him she had arrived safely. However, on this night, a Maplewood Police Officer drove his patrol vehicle directly in Ms. Webb's path between her vehicle and the Wal-Mart entrance, preventing Ms. Webb from completing the telephone call to her husband and from completing her short walk into work.

58.     Maplewood Officer Eric Forest got out of his vehicle and shouted "Whose vehicle

is that? Get back in the car!" Ms. Webb peacefully complied, and asked, "What have I done wrong?" Ms. Webb also informed the Maplewood Officer that she worked at the Wal-Mart store, and asked the officer to allow her to contact her manager inside so that she would not be penalized for being late. She was wearing her Wal-Mart uniform, including a vest and name badge.

59.     The Maplewood Officer did not allow Ms. Webb to leave her car to go inside her workplace, and when Ms. Webb asked if she could at least call her supervisor on the phone, Officer Forest said "no."

60.     Ms. Webb then asked if she could call her husband to let him know she had made it to work safely, and to inform him that she had been stopped by the Maplewood police, but the Maplewood Officer did not allow Ms. Webb to do so.

61.     The Maplewood Officer forced Ms. Webb to remain in her car for over thirty (30) minutes while he ran her license plates and driver's license.

62.     The Maplewood Officer informed Ms. Webb that he had discovered a warrant issued by the City of Webster Groves for an alleged "Failure to Appear" and told Ms. Webb, "I could lock you up, you know. Or I could be nice." Ms. Webb felt powerless and afraid at that point, and was fearful that she would be arrested and jailed.

63.     The Maplewood Officer then told her he chose to "be nice" and issued three municipal citations against Ms. Webb for Failure to Register Vehicle, Failure to Provide Proof of Insurance, and Failure to Wear Seatbelt.

64.     On information and belief, Defendant Maplewood eventually issued a "Failure to Appear" warrant—with a corresponding bond or warrant recall fee—against Ms. Webb in connection with these citations.

65.     Once the Maplewood Officer left, Ms. Webb went to work, where her supervisor had to assess "points" which would count against her within Wal-Mart's point-based termination system.

66.     Ms. Webb was able to keep her job at Wal-Mart despite the Maplewood Officer's interference that night. However, this would not be the last time Maplewood Officer Forest interfered in Ms. Webb's life and work.

67.     On a night sometime in late May or early June 2016, Ms. Webb was driving a newer, more reliable (used) vehicle. After the first Maplewood police interference, the Webbs decided to sell the previous vehicle for which Maplewood ticketed Ms. Webb, as described above, because the Webbs could not afford to pay for the many significant repairs the vehicle needed in order to pass inspection.

68.     That evening, Ms. Webb pulled up to a four-way stop sign at the entrance of the Wal-Mart parking lot, where she made a complete stop and turned on her left turn signal to indicate her intention to turn into the Wal-Mart parking lot.

69.     There, she noticed a Maplewood police car had already stopped at the sign opposite Ms. Webb, so Ms. Webb waited for the Maplewood police car to proceed through the intersection before Ms. Webb turned left.

70.     The officer within the police car waived his hand to Ms. Webb to signal that Ms. Webb could turn left into the parking lot first.

71.     Ms. Webb obeyed the officer's gesture and pulled into the parking lot entrance. On this particular night, the Wal-Mart parking lot where Ms. Webb normally parked was undergoing maintenance, so she parked her vehicle near other employee vehicles in the adjacent Sam's Club parking lot, which was further from the Wal-Mart entrance than usual. Additionally,

because it was nearly 10:00 p.m. and the Sam's Club store was closed, the Sam's Club parking lot was unlit and very dark.

72.     Ms. Webb parked and began to exit the vehicle. The new vehicle visibly displayed a valid temporary vehicle registration affixed to the interior of the rear window in the upper left-hand corner.

73.     Per her usual routine, Ms. Webb exited her vehicle and reached for her cell phone to call her husband while walking into work just a few minutes before 10:00 p.m. Once again, however, a Maplewood police car quickly pulled in front of Ms. Webb's path and blocked her from advancing toward work.

74.     The Maplewood police officer stepped out of his vehicle, and Ms. Webb immediately recognized him as Officer Forest, the same officer who had confronted her in the Wal-Mart parking lot months prior.

75.     Ms. Webb stated to Officer Forest that she had a new car now, with current temporary tags and proper insurance, and that she was in compliance with the law.

76.     Once again, Officer Forest ordered Ms. Webb to get back into her car because her temporary tags were not visible. Ms. Webb attempted to reach to the rear window of the vehicle to show the officer the tags, at which point he grabbed Ms. Webb by the left arm, pulled her from the vehicle, and pushed her up against her vehicle.

77.     Within moments, two additional Maplewood patrol cars and two additional Maplewood officers arrived on the scene.

78.     Ms. Webb stated to Officer Forest "I know my rights" and that she had not done anything wrong.

79.     In response, Officer Forest then placed handcuffs on Ms. Webb, and in doing so,

inadvertently cuffed one of Ms. Webb's purse handles between the handcuff and Ms. Webb's arm.

80.     The three officers on the scene began shouting for Ms. Webb to drop her purse and simultaneously began pulling on the purse. At this point, Ms. Webb screamed out "You're hurting me! It's stuck!" but the officers continued to pull on the purse several more times until they realized their careless mistake.

81.     Once the Maplewood officers removed the purse and re-handcuffed Ms. Webb, they searched through her purse, dumping out its contents until they found her identification. The entire time, Ms. Webb told them her full name and continued to ask what she had done wrong.

82.     Ms. Webb pleaded with the three officers to please let her go into work, and informed them that she would be fired if she was late again. The officers refused Ms. Webb's pleas, and took her cell phone to prevent her from calling inside to the Wal-Mart store.

83.     Ms. Webb noticed that a woman walking nearby had stopped to film the incident on her mobile phone. Ms. Webb shouted to the woman to please call her husband to tell him Maplewood police were arresting her. The woman agreed and asked Ms. Webb for the number. As Ms. Webb began to shout the number to the woman, the Maplewood officers yelled over Ms. Webb to "shut up" and "be quiet" and tried to prevent Ms. Webb from relaying the information to the woman nearby.

84.     The officers placed Ms. Webb in the back of one of the patrol cars and transported her to the Richmond Heights Jail.

85.     Ms. Webb began to fear for her safety and for her life at this point. She was not sure whether her husband would know what had happened to her because the officers had possibly prevented the bystander from hearing Ms. Webb calling out Mr. Webb's telephone

number.

86.     Ms. Webb arrived at the Richmond Heights jail at approximately 10:40 p.m. After approximately one hour, Ms. Webb was booked, fingerprinted, and permitted to use her cell phone to call her employer, but no one at Wal-Mart answered when Ms. Webb telephoned. Shortly thereafter, the Richmond Heights and Maplewood officials took Ms. Webb's cell phone, shoelaces, and Wal-Mart vest, and locked her in a holding cell.

87.     Ms. Webb sat in the Richmond Heights holding cell for over two (2) hours, during which time she was not allowed to place a telephone call to her husband.

88.     During this time, neither the Richmond Heights officials nor Maplewood officials had informed Ms. Webb of the basis for her detention.

89.     At one point, Ms. Webb asked the Richmond Heights and Maplewood officials at the jail to please let her go because she had done nothing wrong and feared she was going to lose her job. One of the officials replied: "You're not going anywhere."

90.     Again, Ms. Webb feared for her safety and for her life in the hands of these municipal officials. To this day, Ms. Webb recalls the emotions she experienced during that moment as feeling "powerless" and "helpless" because "I'm in their world now."

91.     Finally, after several hours, Richmond Heights permitted Ms. Webb to telephone her husband. While on the phone, Mr. Webb asked Ms. Webb how to get her out of jail. Ms. Webb pleaded with the Richmond Heights jailer to tell her sufficient information to relay to her husband so that he could bail her out. The Richmond Heights jailer tersely stated "Go pay $300 to Webster Groves, and then bring $550 to Richmond Heights." Ms. Webb relayed this information to her husband quickly, and then the Richmond Heights jailer cut off the call.

92.     Sometime later, at or around 3:00 a.m., after having first driven to the Webster

Groves police department to pay $300, Mr. Webb and the Webb's church pastor, Rev. Patrick Reel, finally arrived at the Richmond Heights jail. They paid the additional $550 demanded by Maplewood to free Ms. Webb from captivity.

93. As the Webbs and Rev. Reel walked out of the Richmond Heights Jail, Officer Forest was standing nearby and stated to Ms. Webb: "Next time, just say 'hello' to me."

94. Ms. Webb felt this statement was intended to intimidate and humiliate her, and to reinforce in Ms. Webb a fear of the Maplewood police and of Officer Forest.

95. Then, to make matters even worse, the Webbs discovered upon Ms. Webb's release that the City of Maplewood had also towed their family vehicle from the Sam's Club parking lot to the Maplewood impound lot. So, the Webbs went to the Maplewood impound lot, operated by a private towing service, and paid an additional amount exceeding $200 to recover their family vehicle.

96. Altogether, the Webbs had to pay Defendant Maplewood and Webster Groves a total amount exceeding One Thousand Dollars ($1,000) as a result of the Defendant Maplewood's actions toward Ms. Webb.

97. In addition to paying over $1,000 that evening, Ms. Webb returned to work at Wal-Mart the next week, only to learn that she had been fired because she had not shown up for work the night she was arrested. The Wal-Mart manager could not make an exception to Wal-Mart's policy, but told her she could re-apply after 90 days and start over.

98. Defendant Maplewood completely erased Ms. Webb's tireless efforts to secure a promotion and full-time benefits for herself and her family. As a result, the Webbs lack health insurance, life insurance, retirement savings, and steady income.

99. Since the Maplewood arrest ended Ms. Webb's employment at Wal-Mart, Ms.

Webb has not been able to secure full-time employment, and has only found part-time seasonal work for $8.00 per hour at a local non-profit.

100.     Maplewood charged Ms. Webb with "Disorderly Conduct" and "Failure to Comply" following her arrest, which remain pending and for which Maplewood seeks a large monetary fine along with court costs.

101.     As of this filing, Defendant Maplewood has not made an inquiry or determination of Ms. Webb's ability to pay any fines or fees, and Defendant Maplewood never made an inquiry as to whether she could afford to pay the $550 warrant recall bond.

102.     As a result of Maplewood's conduct, which was performed pursuant to its policies and procedures, Ms. Webb and her family fear that they cannot safely travel and go about their normal, peaceful lives in the St. Louis region because they cannot afford to pay the fines and costs associated with the underlying municipal charges if pulled over and/or arrested. Ms. Webb and her family now fear they can be arrested at any time, for any reason, even if they are in full compliance with the law.

**ii.     Darron Yates**

103.     Darron Yates ("Mr. Yates") is a 48-year-old African-American resident of University City, Missouri who lives with his elderly mother.

104.     Mr. Yates suffers from disabilities, and as a result is unemployed with the exception of earning minimal income from sporadic odd jobs.

105.     Late on the evening of January 28, 2016, Mr. Yates was driving a neighbor's vehicle in Maplewood when the vehicle ran out of gas near a Wal-Mart store.

106.     Mr. Yates walked down to the QuikTrip gas station on Hanley Road and filled his gallon can of gas. While he was walking, he noticed a Maplewood police squad car nearby, and

the officers inside it were watching Mr. Yates.

107.    Mr. Yates took the gas can back to the vehicle, refueled it, and started the vehicle.

108.    Mr. Yates drove approximately one block and was stopped by the same Maplewood police officers from the squad car, and then two more Maplewood police squad cars arrived.

109.    The Maplewood police began searching the vehicle without Mr. Yates' permission or consent and without a warrant.

110.    The Maplewood officers claimed the search was due to a report that someone in the neighborhood had been stealing property from inside other vehicles.

111.    During the traffic stop, Mr. Yates witnessed a young teenager riding a skateboard nearby and holding what Mr. Yates believed to be GPS devices and cables that appeared to be stolen from other vehicles. Mr. Yates alerted the Maplewood police officers that the teenager appeared to be their actual theft suspect, but the Maplewood officers ignored Mr. Yates and the teenager passing by.

112.    The Maplewood police officers peeled off the license plate stickers from the vehicle and told Mr. Yates the vehicle was improperly licensed. The officers held Mr. Yates against the hood of the vehicle and patted him down.

113.    The officers then made Mr. Yates sit on his hands on the curb and interlock his legs, where he remained for about 20 minutes in the cold while the Maplewood officers searched the vehicle and wrote tickets.

114.    Mr. Yates informed the Maplewood officers that the car belonged to his neighbor, and asked if he could simply return the vehicle home to the neighbor. The Maplewood officers refused Mr. Yates' request and issued three tickets citing Mr. Yates for the following charges:

    a.   Driving while suspended;

    b.   Failure to Provide Proof of Insurance; and

    c.   Failure to Obtain Proper Vehicle Registration.

115.    Because the Maplewood officers refused to let Mr. Yates drive the vehicle back to his neighbor, Mr. Yates had to call a relative to come pick up the vehicle and return it to the neighbor.

116.    Due to a printing defect, the ticket itself did not clearly state the date and time for his first court appearance, but Mr. Yates believed that he could make out the date from the botched printing.

117.    On the evening Mr. Yates believed to be his first scheduled court appearance, Mr. Yates telephoned the Maplewood Court to inquire as to the time and date of his court appearance. The Maplewood clerk told Mr. Yates "You are too late" and told Mr. Yates not to come to the Maplewood court because "the doors are closed already" and that a warrant had been issued for his arrest.

118.    Mr. Yates asked for a new court date and requested the warrant be recalled. In response, the Maplewood clerk told him there were only two ways to get the warrant recalled at that point: (1) that he could bring $500 to the court; or (2) he could come turn himself for arrest in at the Maplewood Court and sit in jail.

119.    Mr. Yates did not have $500 and was afraid he would be arrested if he went to the Maplewood court to ask the judge to recall the warrant and eliminate the bond on the basis of his indigence.

120.    One evening in April 2016, Mr. Yates was collecting bulk items from the street when University City police stopped Mr. Yates and accused him of stealing and trespassing.

121.    The University City police arrested Mr. Yates, charged him with trespassing, and took him to the University City jail, where Mr. Yates was held for over twenty (20) hours in hazardous conditions.[5]

122.    After 20 hours, University City police told Mr. Yates they were releasing him on a recognizance bond (without requiring payment) from the University City charges, but refused to let Mr. Yates leave the jail because they had discovered an active Maplewood warrant in their computer system.

123.    The University City police called the Maplewood police department five (5) times over the course of the next eight (8) hours to come retrieve Mr. Yates.

124.    Finally, Maplewood police came to the University City Jail and transported Mr. Yates to the Richmond Heights Jail to be held on the Maplewood warrant. The Richmond Heights jailers told Mr. Yates: "Your bond is going to be $500."

125.    Mr. Yates could not afford to pay any amount of money to get out of jail, let alone $500, so Richmond Heights continued to hold Mr. Yates in jail on behalf of Maplewood.

126.    Mr. Yates remained in jail for two (2) days because he could not pay the $500 bond.

127.    While in jail, Mr. Yates observed that nine of the ten inmates in the Richmond Heights Jail were African-American. Seven of the ten were African-American men, including Mr. Yates.

128.    At the conclusion of the second full day in jail, Maplewood Municipal Judge Brian Dunlop came to the Richmond Heights Jail to see Mr. Yates and the other persons

---

[5] *See University City Police Department Building Condemned at City Council Meeting*, WALB NEWS 10, (Feb. 23, 2016), http://www.walb.com/story/31289651/university-city-police-department-building-condemned-at-city-council-meeting.

incarcerated on Maplewood warrants.

129.     Judge Dunlop scolded Mr. Yates in front of the other detainees, stating: "Darron, you're going to learn not to drive in *my* city without a license." Mr. Yates pleaded with Judge Dunlop to let him out of jail and release him for his "time served," which at that point was nearly three days (over 20 hours in University City plus 48 hours in Richmond Heights). Judge Dunlop denied Mr. Yates' request to release Mr. Yates for time served, and only lowered Mr. Yates' bond to $200.

130.     Judge Dunlop told Mr. Yates that once Mr. Yates came up with the $200, he should "just come to court, you'll be fine."

131.     After the Maplewood judge left the jail, one of the Richmond Heights jailers told Mr. Yates to call someone to get money using the in-cell "TIP Systems" calling system. Mr. Yates telephoned his mother, Ms. Janice Yates, at their home.

132.     Ms. Janice Yates received the call and eventually brought $200 of her personal money to pay Maplewood to release Mr. Yates from the Richmond Heights jail. Ms. Yates informed her son that this money was her "bill-paying-money" that she had intended to use to pay utilities and to buy groceries, and that Mr. Yates would have to repay his mother.

133.     Upon Mr. Yates' release, his underlying traffic tickets were placed on the Maplewood Court "payment docket," even though Mr. Yates had not pleaded guilty to any of the charges, and despite Mr. Yates requesting the tickets be scheduled for a trial setting.

134.     Fearful of another warrant, Mr. Yates appeared at the scheduled Maplewood court payment docket, where Mr. Yates informed the court that he could not afford to make any payments and had not pleaded guilty to any charges. In response, Maplewood Judge Dunlop told Mr. Yates "this case is getting old" and tried to persuade Mr. Yates to simply plead guilty to all

three charges and set up a payment plan with the prosecutor and the clerk.

135.    Mr. Yates did not wish to agree to a guilty plea or payment plan, as he could not afford to pay the amount of fines demanded. At that time, Mr. Yates asked the Maplewood prosecutor to accept his "time served" in lieu of payment, but the prosecutor stated "we aren't allowed to do that by law," which was a false representation.[6] Mr. Yates then requested a trial date.

136.    At the date and time Maplewood scheduled the trial, Mr. Yates appeared with his *pro bono* counsel to present his case, but the City of Maplewood failed to produce any police officer witness to the charges. Having waited for the City's absent witness for approximately two hours, Mr. Yates and his counsel demanded to proceed with the trial nonetheless, or to have the court dismiss the action, and the court refused both requests and granted the prosecutor's request to continue the matter for another trial date over Mr. Yates' objections.

137.    Mr. Yates has not received a refund of the $200 bond monies paid to Maplewood for his release from the Richmond Heights jail.

138.    As of the date of this filing, the City of Maplewood refuses to consider Mr. Yates' inability to pay any fines or fees, including the $200 bond money he had to borrow from his mother.

139.    Mr. Yates retained ArchCity Defenders to attempt to resolve the underlying Maplewood violations, but continues to live in fear of being arrested again because of his inability to pay.

---

[6] *See* R.S.Mo. 558.031.1, which states: "A sentence of imprisonment shall commence when a person convicted of an offense in this state is received into the custody of the department of corrections or other place of confinement where the offender is sentenced. Such person shall receive credit toward the service of a sentence of imprisonment for all time in prison, jail or custody after the offense occurred and before the commencement of the sentence, when the time in custody was related to that offense . . . ."

### iii.    Robert Eutz

140.    Robert Eutz ("Mr. Eutz") is a 36-year-old African-American resident of the City of St. Louis, Missouri who works part time at a fast-food restaurant earning $8.00 per hour. He is the fiancée of Plaintiff Krystal Banks.

141.    Sometime in October 2013, Mr. Eutz had nearly completed a routine drive home through the City of Maplewood when a Maplewood police officer turned on his police lights to pull Mr. Eutz over.

142.    Mr. Eutz was so close to home when the officer turned on his police lights that Mr. Eutz pulled into his own apartment driveway.

143.    At the time, Mr. Eutz's vehicle bore temporary tags, which were still current. Mr. Eutz had not committed any moving violations. The Maplewood police officer did not disclose why he stopped Mr. Eutz, yet wrote a ticket citing Mr. Eutz for driving with a suspended license.

144.    Defendant Maplewood issued an arrest warrant for Failure to Appear after Mr. Eutz's first court date.

145.    In 2014, Mr. Eutz moved to the State of Indiana, but moved back to St. Louis in October 2015 to care for his mother, who had fallen ill.

146.    Sometime after Mr. Eutz returned to St. Louis, Florissant police arrested Mr. Eutz and held him in the Florissant Jail for approximately ten (10) hours before Mr. Eutz could be processed and post bond.

147.    At the Florissant Jail, the Florissant jail official told Mr. Eutz that a Maplewood warrant was still active against Mr. Eutz. The Florrisant jail official telephoned a Maplewood official, and then relayed to Mr. Eutz that Maplewood said "they wouldn't come get [him], but they said 'you still have a warrant.'"

148.     Mr. Eutz telephoned the Maplewood court once he was released from the Florissant Jail and asked for a new court date. The Maplewood clerk told Mr. Eutz that "Maplewood doesn't do any warrant recalls" and that the bond to recall his warrant was $800.

149.     Mr. Eutz informed the Maplewood clerk that he could not pay the $800, but the Maplewood clerk refused to recall the warrant.

150.     Mr. Eutz then sought assistance from a private attorney, who informed Mr. Eutz that he also knew that Maplewood's policy is to refuse to recall all warrants until Maplewood can either (1) collect the entire warrant recall fee, or (2) arrest and hold individuals in jail for approximately 48 hours or until they can pay the fee.

151.     Mr. Eutz cannot afford to pay the $800 warrant recall fee to Maplewood, and so, as of the date of this filing, the Maplewood warrant remains active against Mr. Eutz, preventing him from obtaining new or additional employment, and further jeopardizing his ability to complete an unrelated probation matter.

152.     Maplewood has refused to entertain Mr. Eutz's Motions for Warrant Recall unless Mr. Eutz accompanies his attorney to the Maplewood court; a risk Mr. Eutz is afraid to take because he believes Maplewood would lock him in jail if and when his motion is denied.

153.     Because the Maplewood warrant remains active, Mr. Eutz is fearful when leaving his home and traveling throughout the St. Louis region.

**iv.     Anthony Lemicy**

154.     Anthony Lemicy ("Mr. Lemicy") is a 37-year-old African-American man who suffers from homelessness and underemployment.

155.     Between the years 2013 and 2014, Mr. Lemicy was pulled over while driving through Maplewood on at least two (2) separate occasions; on each occasion, Maplewood police

cited Mr. Lemicy for multiple charges arising from his poverty and subsequent inability to pay for services required by law, including, *inter alia*, inadequate vehicle registration and failure to provide insurance.

156.     Sometime in 2013, Mr. Lemicy was arrested pursuant to an alleged "Failure to Appear" warrant issued by Maplewood, which was subject to a $500 recall bond.

157.     Mr. Lemicy could not pay Maplewood the $500 bond, so Maplewood placed Mr. Lemicy in the Richmond Heights jail and detained him for approximately three (3) days before releasing him.

158.     Then, in August 2014, Mr. Lemicy was arrested a second time, pursuant to an alleged "Failure to Appear" warrant issued by Maplewood, also subject to a $500 recall bond.

159.     Again, Mr. Lemicy could not afford to pay Maplewood the $500 bond, so Maplewood again placed Mr. Lemicy in the Richmond Heights jail and detained him for approximately three (3) days before releasing him.

160.     On December 8, 2015, after having spent eight months in the St. Louis City jail on an unrelated charge, which was ultimately dismissed, the St. Louis City police released Mr. Lemicy into the custody of the Richmond Heights police department because there was yet another outstanding Maplewood warrant for an alleged "Failure to Appear" by Mr. Lemicy.

161.     The Richmond Heights police picked up Mr. Lemicy and transported him to the Richmond Heights jail. The Richmond Heights jailer told Mr. Lemicy he was not going to hold Mr. Lemicy pursuant to the outstanding Maplewood warrant because Mr. Lemicy had just spent eight months in jail. The Richmond Heights jailer gave Mr. Lemicy a court date to appear in Maplewood.

162.     In January 2016, Mr. Lemicy appeared in Maplewood Court to resolve the

underlying issues, and asked the Maplewood judge to give him credit for "time served" for his previous six (6) days in Maplewood custody and his eight months in St. Louis City. The Maplewood judge told Mr. Lemicy "we can't do time served," and sentenced Mr. Lemicy to perform forty (40) hours of community service in lieu of monetary fines and costs.

163.    Nonetheless, the Maplewood Court reset the matter for June 3, 2016, on which date it issued an arrest warrant against Mr. Lemicy for an alleged Failure to Appear, attaching to it a $400 recall fee.

164.    When Mr. Lemicy learned of the warrant, he telephoned the Maplewood Court and spoke to the Maplewood clerk to request a new court date. The Maplewood clerk informed Mr. Lemicy that a warrant recall fee of $400 was now in effect. Furthermore, the Maplewood clerk informed Mr. Lemicy that it was the policy and procedure of the Maplewood Court that there were only two ways to get a warrant recalled: (1) pay the entire $400 bond or warrant recall fee; or (2) turn himself in at the Maplewood Court and sit in jail for 48 hours.

165.    Mr. Lemicy asked the Maplewood clerk if the warrant recall fee could be waived entirely, since he was awarded community service in lieu of payment, and the Maplewood clerk told Mr. Lemicy that a waiver was not possible.

166.    Mr. Lemicy then asked the Maplewood clerk if the fee could be reduced, or if he could set up a payment plan, to which the Maplewood clerk replied that "$400 is the smallest amount [Maplewood] could accept."

167.    The Maplewood clerk told Mr. Lemicy to "come to court on Friday" to talk about the warrant. Mr. Lemicy feared that doing so may result in his incarceration, since he did not have $400 to bring with him to the Maplewood Court.

168.    Mr. Lemicy then contacted the Maplewood Assistant City Manager, Anthony

Traxler, to seek help resolving the warrant. Mr. Traxler told Mr. Lemicy that he was unable to assist Mr. Lemicy, but did inform him that the Maplewood Court does not hold sessions on Fridays, and that Mr. Lemicy would likely be arrested if he showed up at the Maplewood Courthouse on that Friday without the $400 bond money.

169.     As a result of the many minor municipal charges and the alleged Failure to Appear charges by Maplewood, Mr. Lemicy's driver's license has been suspended. This suspension, along with the warrants, prevented Mr. Lemicy from obtaining steady, gainful employment.

170.     Maplewood continuously refused to entertain Mr. Lemicy's Motions for Warrant Recall unless Mr. Lemicy accompanied his attorney to the Maplewood court—a risk Mr. Lemicy was afraid to take because he believed Maplewood would lock him in jail if he appeared without money.

171.     On August 15, 2016 Maplewood denied a Motion to Recall Warrant raised by Mr. Lemicy's *pro bono* counsel because Mr. Lemicy was not physically present at the court when the motion was raised.

172.     On September 12, 2016 Mr. Lemicy reluctantly appeared at the Maplewood court with his *pro bono* counsel and once again raised his Motion to Recall Warrant. After persistent begging by both Mr. Lemicy and his *pro bono* counsel, the Maplewood Judge agreed to recall the warrant, stating that the only reason the Judge granted the motion was because Mr. Lemicy had "found himself a persistent lawyer."

**v.     Krystal Banks**

173.     Krystal A. Banks ("Ms. Banks") is a 23-year-old African-American mother living in the City of St. Louis, Missouri and working part time as an assistant for a doctor's office in

Creve Coeur, Missouri. She supports herself and her three-year-old child on a limited income.

174.     Sometime in 2013, Ms. Banks was driving her fiancée Robert Eutz to work in a used vehicle Ms. Banks had recently purchased, when she was pulled over by a Maplewood police officer in a McDonald's parking lot on the corner of Big Bend and Oxford in the City of Maplewood.

175.     The Maplewood officer informed Ms. Banks that he had pulled her over for failure to use her turn signal. Ms. Banks informed the officer that she had used her turn signal, and that the officer would not have been able to see her turn signal based on the location of the officer's patrol car and nearby traffic.

176.     Nonetheless, the Maplewood officer issued a total of seven (7) citations, which included citations for failure to provide registration and failure to wear a seatbelt.

177.     Ms. Banks personally attended her first Maplewood court appearance on the citations, where she pleaded guilty to the charges and agreed to make $50 monthly payments for six (6) months, totaling $300 in fines, along with additional court costs.

178.     At some point thereafter, Defendant Maplewood issued a warrant to arrest Ms. Banks for nonpayment.

179.     Later, one morning in July 2014, Ms. Banks was driving to work at a children's retail store in a vehicle bearing temporary license plates.

180.     One of Defendant Maplewood's police officers pulled Ms. Banks over and arrested Ms. Banks on the Maplewood warrant for nonpayment.

181.     The Maplewood officer took Ms. Banks to a jail in the municipality of Brentwood, Missouri, where her bond was set at an amount exceeding One Thousand Dollars ($1,000.00).

182.     Ms. Banks could not afford to pay such a large amount of money, so she remained in jail.

183.     At some point, the Maplewood arresting officer telephoned the Maplewood court, and, on information and belief, the Maplewood judge or Maplewood clerk reduced Ms. Banks' bond to Six Hundred Forty Six Dollars ($646.00).

184.     The Maplewood police officer then inspected Ms. Banks' purse and removed about $300—all of the cash Ms. Banks had received from cashing her paycheck the previous day.

185.     The Maplewood officer held up the money and said to Ms. Banks, "Here you go. You have half of it right here. Go make a phone call and see if anybody else can come up with the other half, or you'll have to sit in jail for the next two or three days."

186.     Ms. Banks then used the Brentwood Jail telephone to call her mother, Angela Banks, who eventually came to the Brentwood Jail and paid the remaining bond amount with her own money.

187.     Ms. Banks spent over five (5) hours in jail in order for Maplewood to extract $646 from Ms. Banks and her mother. She missed work that day and ultimately had to find new employment.

188.     Upon her release, Ms. Banks did not receive any notice of a new court date, nor any confirmation that her warrant was recalled.

189.     Later sometime in the spring of 2016, Ms. Banks received an employment offer at a doctor's office in downtown St. Louis, Missouri that was contingent upon a clear background check.

190.     When Ms. Banks received the results of the background check, she discovered

that the Maplewood warrant remained active, despite her previous incarceration and payment of $646 to Maplewood.

191.    Ms. Banks then telephoned the Maplewood court clerk, Ruth Swallows, who told Ms. Banks that she had to pay Five Hundred Dollars ($500.00) to get the warrant recalled.

192.    Ms. Banks informed the Maplewood clerk that she could not afford to make any payment, let alone the full $500, and asked the Maplewood clerk if she could recall the warrant and set a new court date. The Maplewood clerk said "No, you missed your court dates, so court costs went up." The Maplewood clerk informed Ms. Banks that a new court date had been set following her release from incarceration but that her file indicated that nobody had appeared on that date.

193.    Ms. Banks informed the Maplewood clerk that she never received notice of the new court date, but the Maplewood clerk informed Ms. Banks that the Maplewood policy requires that Ms. Banks either pay the full $500 or to come down to the Maplewood court and turn herself in.

194.    Ms. Banks feared and continues to fear arrest because of her inability to pay the $500 warrant recall fee.

195.    Ms. Banks' *pro bono* attorney submitted a Motion to Recall Warrant with the Maplewood court, and attempted to argue the motion on August 15, 2016. The Maplewood Court refused to hear the motion and ignored counsel's additional request for an indigency determination.

196.    Because Ms. Banks could not and cannot afford the $500 fee to remove the warrant, she was unable to accept the employment offer at the doctor's office in downtown St. Louis due to the active Maplewood warrant.

197.     As of the date of this filing, the Maplewood arrest warrant against Ms. Banks—which stems from municipal charges that are now almost three years old—remains active.

198.     Maplewood has refused to entertain Ms. Banks' Motions for Warrant Recall unless Ms. Banks accompanies her attorney to the Maplewood court—a risk Ms. Banks is afraid to take because she believes Maplewood would lock her in jail if and when her motion is denied.

199.     But for the Maplewood warrant, Ms. Banks would not have lost the job opportunity in downtown St. Louis, which would have been easily accessible via public transit.

200.     Because the warrant remains active, Ms. Banks is fearful when leaving her home or travelling throughout the St. Louis region, including the twenty-plus-mile round trip commute to her job in Creve Coeur.

**vi.     Frank Williams**

201.     Frank Williams ("Mr. Williams") is a 56-year-old African-American man who lives in the City of Maplewood. He is also the father of Plaintiff Cecelia Roberts Webb.

202.     Due to a mental disability preventing Mr. Williams from comprehending and recalling information he has seen or read, Mr. Williams is functionally illiterate. Additionally, he suffers from physical disabilities including asthma, high blood pressure, and chronic back pain. As a result, Mr. Williams cannot secure gainful employment and receives a very small amount of money each month from Social Security, with which he must pay for housing, clothing, medicine, food, and transportation.

203.     Throughout his life, Mr. Williams has been arrested and jailed over ten (10) times by various municipalities in the St. Louis region for minor municipal code violations, including in the Defendant City of Maplewood, in 1994, 1995, 1996, 1998, 2005, 2010, 2011, 2014, and as recently as 2016.

204.    On information and belief, Mr. Williams estimates that in his lifetime he has paid over $10,000 in bail fees, court costs, and fines to local municipalities, including Maplewood, all for minor municipal infractions.

205.    In February 2012, Defendant Maplewood issued Mr. Williams a ticket for "Failure to Produce Insurance ID."

206.    One evening in 2014, Mr. Williams was returning home from a trip to the grocery store, where he had used what little money he had remaining after paying for housing and medicine to purchase his weekly supply of groceries. Mr. Williams was pulled over by Maplewood police and immediately arrested on a warrant issued by Defendant Maplewood and taken to the Richmond Heights Jail. The money Mr. Williams spent on groceries went to waste while his groceries spoiled in his vehicle.

207.    Maplewood also towed Mr. Williams' vehicle to an impound lot, where Mr. Williams' wife would eventually have to pay over $100 to have it released.

208.    Maplewood officials initially demanded that Mr. Williams pay $300 in exchange for his release.

209.    Mr. Williams informed Defendant Maplewood and officials at the Richmond Heights Jail that he could not afford to pay $300 for his release, jail officials ran Mr. Williams' name through their electronic REJIS warrant database and noticed an active warrant from the City of Jennings, which, on information and belief, may have been generated by "Failure to Appear" charges related to traffic tickets that were more than ten (10) years old.

210.    Defendant Maplewood transferred Mr. Williams to the City of Jennings Jail after two (2) hours in the Richmond Heights Jail, where the Jennings officials informed Mr. Williams that his bond for Maplewood was now $500 and his bond for Jennings was $1,500.

211.     Mr. Williams informed the Jennings officials that he could not afford to pay the Maplewood bond and sat in the Jennings jail for over fourteen (14) days. At the Jennings jail, in the course of those two weeks, Mr. Williams was allowed to shower only once. For those two weeks, Mr. Williams was denied a toothbrush and toothpaste. He was forced to sleep on a steel platform without a mattress, pillow, or covers. Worst of all, for two weeks, Mr. Williams was denied his blood pressure and asthma medication.

212.     At all times, Mr. Williams was unable to use the jail telephone.

213.     After suffering in the Jennings Jail for two weeks, Mr. Williams and the other incarcerated individuals were taken upstairs to the Jennings court, where Mr. Williams informed the judge that he only received disability income and could not afford to pay the Maplewood bond nor the Jennings bond.

214.     Mr. Williams recalls that the judge told him that since Mr. Williams did not have any money, "he should just stay right here"—in jail—until he could pay the bond amounts for both Maplewood and for Jennings.

215.     At the conclusion of Mr. Williams' interaction with the judge, Mr. Williams was once again transferred to another jail, this time the St. Louis City Jail. Mr. Williams remained in the St. Louis City Jail for two more days, where the St. Louis City jail officials determined that sixteen (16) days in jail was "long enough" and allowed Mr. Williams to leave.

216.     Upon Mr. Williams' eventual release, after having survived 16 days in jail without his necessary medication, Mr. Williams' blood pressure levels had skyrocketed. As a result, Mr. Williams and his physician spent nearly two years adjusting and readjusting Mr. Williams' blood pressure medications to return Mr. Williams to his stable, pre-incarceration levels.

217.    Then, on February 16, 2016, Defendant Maplewood arrested Mr. Williams, on information and belief, based on a 2012 ticket for Driving with a Suspended License. Mr. Williams did not know his license had ever been suspended.

218.    That same day, Mr. Williams paid a $500 cash bond to avoid spending time in jail. Upon payment of the bond, Defendant Maplewood issued a written Summons to Mr. Williams setting a court date of March 28, 2016 at 6:00 p.m.

219.    On March 29, 2016, Defendant Maplewood arrested Mr. Williams on a warrant for his alleged Failure to Appear at the March 28, 2016 Maplewood municipal court docket.

220.    Mr. Williams spent the next two days in the Richmond Heights Jail until he was able to pay Maplewood's additional $300 warrant bond for his release.

221.    As a result of the conduct of Defendant Maplewood, Mr. Williams is fearful of leaving his home in Maplewood and traveling throughout the St. Louis region because he might get arrested by Defendant Maplewood or any other municipality for minor traffic charges unknown to Mr. Williams.

## F.    Class Allegations

222.    The Plaintiffs bring this action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

223.    A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge the Defendant's unlawful scheme to deny individuals access to the courts as leverage in extorting money warrants, warrant recall fees, arrests, and bonds.

224.    This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

225.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

226.    Plaintiffs propose the following three Classes:

**Rule 23(b)(2) class:**

All persons, whether or not such person has ever been jailed, who have paid or currently owe warrant recall fees or warrant bonds to the City of Maplewood arising from cases in the Maplewood court (the "Injunctive Class");

**Rule 23(b)(3) classes:**

All persons, whether or not such person has ever been jailed, who have paid any amount to the City of Maplewood from fines, fees, costs, or surcharges, including warrant recall fees or warrant bonds arising from cases in the Maplewood court and who have not been provided an opportunity to prove indigence (the "Paid Warrant Bond Class"); and

All persons who have been jailed by the City of Maplewood for non-payment of fines, fees, costs, or surcharges, including warrant recall fees and/or warrant bonds arising from cases in the Maplewood court and who (1) were not been provided an opportunity to prove indigence prior to jailing; (2) were not considered a danger to the community by notation in Maplewood's file; and (3) were not designated as a flight risk at the time of jailing (the "Jailed Class").

**1.    Numerosity. Fed. R. Civ. P. 23(a)(1)**

227.    Over the past five years, Defendant Maplewood has levied arrest warrants with warrant recall fees, warrant bonds, or other pay-for-access fees against thousands of people in order to extort money most of those individuals could not afford. Pursuant to Defendant's policies and practices, Maplewood has placed thousands of people, who could not somehow pay their warrant-related fees in total, under the constant and indefinite threat of arrest and jailing if they do not make the payments in the amount purportedly required by Maplewood.

228.    Maplewood has caused hundreds of people to be kept in nearby jails for non-payment of warrant-related fees in each of the past five years. Defendant Maplewood retains, and

is required by law to retain, records of these instances.

229.     Defendant employed and continues to employ warrant fee policies, practices, and procedures to accomplish the jailing and extortion of monies of the Class members. For example, pursuant to the Defendant's policies and practices, those kept in jail pursuant to alleged non-payment of Maplewood warrant-related fees did not receive meaningful inquiries into their ability to pay as required by federal and Missouri law. Pursuant to Defendant's policies, Defendant made no determinations of indigence, ability to pay hearings, or evaluations of alternatives to incarceration, and the Defendant provided none of the relevant state and federal protections for those arrested. Nor were those jailed pursuant to a Maplewood warrant-related fee provided adequate counsel to represent them. Finally, for those individuals subject to Maplewood warrants and warrant-related fees who were not or have not yet been arrested, Defendant Maplewood's policy and practice is to deny such individuals their access to the courts until those individuals pay the total amounts of warrant-related fees demanded by Maplewood, and to threaten the arrest of those individuals who cannot make those payments.

230.     Those who still owe Maplewood warrant-related fees or other payments or who will incur such fees will be subjected to the same ongoing policies and practices absent the relief sought in this Complaint.

**2.     Commonality. Fed. R. Civ. P. 23(a)(2).**

231.     The relief sought is common to all members of the Injunctive and Damages Classes, and common questions of law and fact exist as to all members of the Classes. The Plaintiffs seek relief concerning whether the Defendant's policies, practices, and procedures violated their rights and relief mandating Defendant to change its policies, practices, and procedures so that the Plaintiffs' rights will be protected in the future.

232.    Among the most important, but not the only, common questions of fact are:

a.  Whether and to what extent, if any, Defendant has a policy and practice of making individuals' ability to access the courts contingent upon payment of warrant-related fees and/or a combination of jail time and bond payments;

b.  Whether Defendant has a policy and practice of failing to conduct meaningful inquiries into the ability of a person to pay before assessing warrant-related fees and before jailing the person for non-payment;

c.  Whether Defendant provides notice to debtors that their ability to pay will be a relevant issue at the proceedings at which they are jailed or kept in jail and whether Defendant makes findings concerning ability to pay and alternatives to incarceration;

d.  Whether Defendant provides adequate legal representation to those jailed for unpaid debts in proceedings that result in their incarceration;

e.  Whether Defendant's employees and agents have a policy and practice of threatening debtors and families of debtors with incarceration for unpaid debts without informing them of their rights;

f.  Whether Defendant has a policy and practice of issuing and executing warrants for the arrest of debtors despite lacking probable cause that they have committed any offense and without any notice or opportunity to be heard concerning their ability to pay or the validity of the debt;

g.  Whether Defendant's policies and practices seek to extort funds from poor residents of the St. Louis area by ensnaring them in an escalating spiral of indebtedness and imprisonment;

h.  Whether Defendant has a policy and practice of providing notice to persons accused of "Failure to Appear" charges and, if so, whether Defendant's notice contains information listed within the notice requirements of Mo. R. Civ. P. 37.33(b); and

i.  Whether Defendant's policies and practices discriminate on the basis of race or other impermissible factors.

233.    Among the most important common question of law are:

a.  Whether the Defendant may withhold information about an individual's court case unless and until the individual pays warrant-

related fees, serves jail time, and/or a combination of jail time and payment of warrant-related fees;

b. Whether the Defendant may withhold, deny access to, or otherwise refuse to disclose to individuals information regarding the individuals' underlying municipal court cases where those individuals cannot afford to pay "warrant recall fees" or other monetary penalties assessed against individuals on the basis of "Failure to Appear" warrants or "Failure to Pay" warrants;

c. Whether the Defendant may deny individuals access to their courtrooms on the basis of the existence of outstanding warrants and unpaid "warrant recall fees" or other monetary penalties assessed against individuals on the basis of "Failure to Appear" warrants or "Failure to Pay" warrants;

d. Whether the Defendant may deny an individual's right to file motions, enter into plea negotiations, or otherwise petition the courts based on that individual's inability to pay "warrant recall fees" or other monetary penalties assessed against individuals on the basis of "Failure to Appear" warrants or "Failure to Pay" warrants;

e. Whether the Defendant may deny an individual's request/motion/demand to certify their municipal cases to the Associate Circuit Court of St. Louis County, Missouri based on the individual's ability to pay "warrant recall fees" or other monetary penalties assessed against the individual on the basis of "Failure to Appear" warrants or "Failure to Pay" warrants;

f. Whether keeping people in jail solely because they cannot afford to make a monetary payment is lawful;

g. Whether people are entitled to a meaningful inquiry into their ability to pay before being jailed by Defendant for non-payment of debts;

h. Whether people who cannot afford to pay Defendant are entitled to the consideration of alternatives to incarceration before being jailed for non-payment of debts;

i. Whether people are entitled to adequate legal representation in debt-collection proceedings initiated and litigated by Defendant's prosecutors that result in their incarceration if they cannot afford an attorney;

j. Whether Defendant may jail, threaten to jail, and use other harsh debt-collection measures (such as ordering payment of significant portions

of a person's public assistance benefits) against debtors who cannot afford immediately to pay the Defendant in full;

k.  Whether the Defendant may arrest people based solely on their non-payment without any probable cause that they have committed any willful conduct or other offense and without notice and an opportunity to be heard concerning legal predicates for a valid detention, such as their ability to pay and the validity of the debt;

l.  Whether the Defendant may impose, assess, and collect "warrant recall fees" or other monetary penalties against individuals for whom "Failure to Appear" warrants or "Failure to Pay" warrants are issued, and whether those "warrant recall fees" or other monetary penalties serve as a barrier to individuals' rights under the First Amendment to access the courts;

m.  Whether the Defendant's policies and procedures to issue "Failure to Appear" charges accompanied by an arrest warrant and a "warrant recall fee" constitutes a presumption of guilt disallowed by Federal and State rules of civil procedure;

n.  Whether the Defendant's policies and procedures to issue "Failure to Appear" charges accompanied by an arrest warrant and a "warrant recall fee" are subject to the notice requirements set forth in Mo. R. Civ. P. 37.33(b), and if so, whether Defendant issued proper Violation Notices when charging individuals with "Failure to Appear" charges;

o.  Whether any and all "Failure to Appear" judgments and fines obtained by the Defendant outside of the Violation Notice requirements under Rule 37.33(b) are void pursuant to lack of due process under Mo. S. Ct. R. 74.06(b)(4); and

p.  Whether the Defendant's continued retention of and benefit from monies collected from Plaintiffs and others similarly situated through Defendant's unlawful "warrant recall fees" creates an inequity that is sufficiently detrimental to Plaintiffs and others similarly situated to justify this Court to award Plaintiffs and others similarly situated restitution.

234.  These common legal and factual questions arise from one central scheme and set of policies and practices: the Defendant's lucrative pay-for-access warrant-related system. Maplewood operates this scheme openly and in materially the same manner every day, and all of the ancillary factual questions about how that scheme operates are common to all members of the

Classes, as well as the resulting legal questions about whether that scheme is unlawful. The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the constitutional relief that they seek.

### 3. Typicality. Fed. R. Civ. P. 23(a)(3).

235.    The named Plaintiffs' claims are typical of the claims of the members of the Classes and Subclasses respectively, and they have the same interests in this case as all other members of the Classes that they represent. Each of them suffered injuries from the failure of Defendant Maplewood to comply with the basic constitutional provisions detailed herein. The answer to whether the Defendant's scheme of policies and practices is unconstitutional will determine the claims of the named Plaintiffs and every other Class member.

236.    If the named Plaintiffs succeed in their claims that the Defendant's policies and practices concerning warrant-related fees attached to failure to pay and failure to appear charges violate the law in the ways alleged in each claim of the Complaint, then that ruling will likewise benefit every other member of the Injunctive and Damages Classes.

### 4. Adequacy. Fed. R. Civ. P. 23(a)(4).

237.    The named Plaintiffs are adequate representatives of the Classes because they are members of the Classes and because their interests coincide with, and are not antagonistic to, those of the Classes. There are no known conflicts of interest among Class members, all of whom have a similar interest in vindicating the constitutional rights to which they are entitled.

238.    Plaintiffs are represented by attorneys from Tycko & Zavareei LLP, a firm with experience litigating complex civil rights matters in federal court and extensive knowledge of both the details of the Defendant's scheme and the relevant constitutional and statutory law.

Plaintiffs are also represented by attorneys from ArchCity Defenders, who have extensive experience with the functioning of the entire municipal court system through their representation of numerous impoverished people in the St. Louis area.[78]

239.     The efforts of Plaintiffs' counsel have so far included extensive investigation over a period of months, including numerous interviews with witnesses, Defendant's employees, families, attorneys practicing in the Defendant's Municipal Courts, community members, statewide experts in the functioning of Missouri municipal courts, and national experts in constitutional law, debt collection, bankruptcy law, criminal law, and forced labor.

240.     Counsel have also observed numerous courtroom hearings in Maplewood and in

---

[7] Tycko & Zavareei LLP is a nationwide law firm with offices in Washington, D.C. and in Oakland, California. It has successfully achieved class-wide relief in numerous consumer class actions for consumer fraud, race discrimination, illegal banking and investment practices, and false product labeling.

[8] ArchCity Defenders is a non-profit public interest law firm based in Saint Louis. It has represented the poor and homeless in cases involving Maplewood and other municipalities for the past five years and is an expert on the ways in which the Defendant's illegal practices and policies make and keep people poor. Most recently, ArchCity Defenders brought a class action against thirteen Missouri municipalities for some of the same practices described in the instant lawsuit. *See Thomas et al. v. City of St. Ann, et al.*, 4:16-cv-01302-RWS (E.D. Mo. 2016). ArchCity Defenders has also recently brought class actions in the Eastern District of Missouri restricting the use of chemical munitions on peaceful protesters, is co-counsel on two federal class actions alleging the operation of debtors' prisons in Ferguson and Jennings, Missouri, two additional class actions ending cash bail, and an additional series of state class action suits alleging the imposition of illegal fees and fines in various municipal courts in the St. Louis County region. *See Templeton v. Dotson*, 4:14-cv-01019; *Jenkins et al. v. City of Jennings*, 15-cv-252-CEJ (E.D. Mo. 2015); *Fant et al. v. City of Ferguson*, 15-cv-253-AGF (E.D. Mo. 2015); *Powell v. City of St. Ann* 4:15-cv-840 (E.D. Mo. 2015); *Pierce v. City of Velda City*, 4:15-CV-570 (E.D. Mo. 2015); *White* v. *City of Pine Lawn*, 14SL-CC04194 (St. Louis Co. Cir. Ct., Dec. 2014); *Pruitt v. City of Wellston*, 14SL-CC04192 (St. Louis Co. Cir. Ct., Dec. 2014); *Lampkin v. City of Jennings*, 14SL-CC04207 (St. Louis Co. Cir. Ct., Dec. 2014); *Wann v. City of St. Louis*, 1422-CC10272 (St. Louis City Cir. Ct., Dec. 2014); *Reed v. City of Ferguson*, 14SL-CC04195 (St. Louis Co. Cir. Ct., Dec. 2014); *Eldridge v. City of St. John*, 15SL-00456 (St. Louis Co. Cir. Ct., Feb. 2015); *Watkins v. City of Florissant*, 16SL-CC00165 (St. Louis Co. Cir. Ct., Jan. 2016). ArchCity Defenders also published an extensive report detailing these practices and policies in the cities of Bel-Ridge, Ferguson, and Florissant in August of 2014. The report is available at http://www.archcitydefenders.org.

other municipalities across the region in order to compile a detailed understanding of state law and practices as they relate to federal constitutional requirements. Counsel have studied the way that these systems function in other cities in order to investigate the wide array of options in practice for municipalities.

241.     As a result, counsel have devoted enormous time and resources to becoming intimately familiar with the Defendant's scheme and with all of the relevant state and federal laws and procedures that can and should govern it. Counsel also have developed relationships with many of the individuals and families most victimized by the Defendant's practices.

242.     The interests of the members of the Class will be fairly and adequately protected by the Plaintiffs and their attorneys.

**5.      Rule 23(b)(2)**

243.     Class action status is appropriate because Defendant, through the policies, practices, and procedures that make up its warrant-related fee and pay-for-access scheme, has acted and refused to act on grounds generally applicable to the Injunctive Class.

244.     A declaration that people jailed on behalf of Maplewood cannot be held in jail solely because they cannot afford to make a monetary payment will apply to each Class member.

245.     Similarly, a determination that Class members are entitled, as a matter of federal law, to access the courts to obtain information, assert defenses, bring motions, and seek certification to a higher court, regardless of their ability to pay warrant-related fees or other pay-for-access fees to Maplewood for non-payment will apply to each Class member.

246.     The same applies to rulings on the other claims, including: that Class members are entitled to representation by counsel at proceedings initiated and litigated by Defendant's prosecutors in connection with which they are jailed; that Maplewood cannot imprison Class

members for debts; that Maplewood cannot collect debts from Class members in a manner that violates and evades all of the relevant protections for other judgment debtors; and that Maplewood cannot issue and execute arrest warrants for traffic debtors without probable cause that they have committed an offense and without notice or a hearing prior to the deprivation of their liberty.

247.     Injunctive relief compelling Defendant Maplewood to comply with these constitutional rights will similarly protect each member of the Class from being again subjected to Defendant's unlawful policies and practices with respect to existing non-appearance or non-payment warrants, the warrant-related fees, and the threat of incarceration debts that they still owe and protect those who will incur such debts in the future from the same unconstitutional conduct. Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

**6.     Rule 23(b)(3)**

248.     Class treatment under Rule 23(b)(3) is also appropriate because the common questions of law and fact overwhelmingly predominate in this case. This case turns, for every Plaintiff, on what the Defendant's policies and practices are, and on whether those policies and practices are lawful.

249.     The common questions of law and fact listed above are dispositive questions in the case of every member of the Classes and Subclasses. The question of liability can therefore be determined on a class-wide basis. Class-wide treatment of liability is a far superior method of determining the content and legality of the Defendant's policies and practices than individual suits by hundreds or thousands of Defendant's residents and persons subject to warrant-related fees and/or jailing by Defendant. The question of damages will also be driven by class-wide

determinations.

250.     To the extent that individual damages will vary, they will vary depending in large part on the amount of money that an individual paid to Maplewood to remove a warrant, bond out of jail, or access the courts, and determination of those damages can easily be ascertained by Defendant's records. Determining damages for individual Class members can thus typically be handled in a ministerial fashion based on easily verifiable records of the length of unlawful incarceration. Additionally, to the extent that individual damages will vary with respect to length of time spent in jail, a single calculation of the value of time spent in jail can be determined. If needed, individual hearings on Class-member specific damages based on special circumstances can be held after Class-wide liability is determined—a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

## CLAIMS FOR RELIEF

### COUNT I
**Violation of the Fourteenth Amendment — Imprisonment For Inability To Pay**

251.     The preceding paragraphs are incorporated herein by reference.

252.     The Due Process and Equal Protection Clauses of the Fourteenth Amendment of the United States Constitution prohibit imprisoning a person for failure to pay money owed to the government if that person is indigent and unable to pay.

253.     Defendant Maplewood imprisoned and/or threatened to imprison each of the Plaintiffs when they could not afford to pay debts allegedly owed for traffic and other minor offenses without conducting any inquiry into their ability to pay and without conducting any inquiry into alternatives to imprisonment, as required by the United States Constitution. At any moment, a person with financial resources in the Plaintiffs' positions could have paid a sum of cash and been released from jail.

254.    Defendant Maplewood maintained and continue to maintain a policy and practice of (i) imprisoning, or threatening to imprison, people, including Plaintiffs, when they cannot afford to pay the debts allegedly owed from traffic and other minor offenses, and (ii) keeping people, including Plaintiffs, in jail unless and until they are able to pay arbitrarily determined (and constantly shifting) sums of money.

255.    Defendant Maplewood's actions violated, and continue to violate, Plaintiffs' rights, and the rights of others similarly situated, under the Fourteenth Amendment to the United States Constitution. Defendant is liable under 42 U.S.C. § 1983.

256.    As a direct result of the Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

## COUNT II
### Violation of First and Fourteenth Amendments—Denial of Access to Courts
### (42 U.S.C. § 1983)

257.    The preceding paragraphs are incorporated herein by reference.

258.    The United States Supreme Court has consistently held that the First Amendment to the U.S. Constitution grants all individuals the a right of access to judicial proceedings, both criminal and civil. Both the place and process of municipal court proceedings in this country have historically been open to the general public, and certainly to individuals summoned to appear therein. Furthermore, the ability of an individual member of the public against whom judicial proceedings are lodged—whether final, stayed, or presently pending—to access those proceedings plays a significant positive role in the functioning of the judicial system.

259.    Each of the Plaintiffs and others similarly situated all possess these rights to access the judicial proceedings of Defendant Maplewood's municipal court pursuant to the First

and Fourteenth Amendments to the United States Constitution.

260.    Furthermore, Defendant's policies and procedures prohibit, deny, discourage, or otherwise lack a procedure by which Plaintiffs and others similarly situated can challenge the amount of the "warrant recall fee" or bond or the underlying "Failure to Pay" or "Failure to Appear" upon which the arrest warrant rests.

261.    Together, Defendant's policies and procedures related to "warrant recall fees" or bonds constitute a deprivation of liberty under the First Amendment, along with a violation of the procedural due process rights of Plaintiffs and others similarly situated under the Fourteenth Amendment. Defendant is thus liable under 42 U.S.C. § 1983.

262.    As a direct result of the Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

263.    Additionally, as a direct result of the Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive actual monetary damages in the form of "warrant recall fees" or other bonds actually paid to Defendant in order to access Defendant's municipal courts.

### COUNT III
**Violation of the Sixth and Fourteenth Amendments—Failure to Provide Adequate Counsel**

264.    The preceding paragraphs are incorporated herein by reference.

265.    Defendant Maplewood violated Plaintiffs' rights, and the rights of others similarly situated, to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution. Plaintiffs, and others similarly situated, have been and continue to be imprisoned by Defendant Maplewood in connection with debt-collection proceedings in which those people jailed are not afforded counsel.

266.     Defendant Maplewood's policy and practice of not providing adequate counsel at hearings in which indigent people are ordered to be imprisoned in the Defendant's jails for unpaid debts (which are, in turn, based on payment plans arising from traffic and other violations at which the jailed individuals also were unrepresented), violates the Sixth and Fourteenth Amendments to the United States Constitution. Defendant is liable under 42 U.S.C. § 1983.

267.     As a direct result of the Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

## COUNT IV
### Violation of the Fourth and Fourteenth Amendments — Issuance of Invalid Warrants

268.     The preceding paragraphs are incorporated herein by reference.

269.     The Defendant's policy and practice is to issue and serve arrest warrants against those who have not paid their debt from old judgments in traffic and other minor cases. These warrants are sought, issued, and served without any inquiry into the person's ability to pay even when Defendant has prior knowledge that the person is impoverished and unable to pay the debts or possesses other valid defenses.

270.     Defendant Maplewood enforces a policy of allowing wealthy residents or residents who can afford to hire an attorney to remove their warrants by payment of money, but refuses to remove warrants assessed against those individuals who cannot afford to pay.

271.     These practices violate the Fourth and Fourteenth Amendments by effecting unreasonable seizures without a fair and reliable determination of probable cause and causing a deprivation of fundamental liberty without adequate due process. Defendant is liable under 42 U.S.C. § 1983.

272.     As a direct result of the Defendant's unlawful practices, Plaintiffs and others

similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

**COUNT V**
**Violation of the Fourteenth Amendment — Threats of Incarceration to Collect Debts**

273.    The preceding paragraphs are incorporated herein by reference.

274.    The United States Supreme Court has held that, when a government seeks to recoup costs of prosecution from indigent defendants—for example, the cost of appointed counsel—it may not take advantage of its position to impose unduly restrictive methods of collection solely because the debt is owed to the government and not to a private creditor.

275.    By incarcerating the Plaintiffs and threatening to incarcerate them, Defendant takes advantage of its  control over the machinery of the penal and police systems to deny debtors the statutory protections that every other debtor may invoke against a private creditor. This coercive policy and practice constitutes invidious discrimination and violates the fundamental principles of equal protection of the laws. Defendant is liable under 42 U.S.C. § 1983.

276.    As a direct result of the Defendant's unlawful practices, Plaintiffs and others similarly situated have suffered extensive damages, including, but not limited to, pain and suffering, anxiety, anguish, feeling of unjust treatment, fear, and lost earnings.

**COUNT VI**
**Declaration that "Failure to Appear" Judgments are Void for Lack of Due Process**
**Pursuant to Mo. R. Civ. P. 37.33(b), Cognizable under Mo. S. Ct. R. 74.06(b)(4).**

277.    The preceding paragraphs are incorporated herein by reference.

278.    In Missouri, a judgment obtained in violation of due process is void. *See* Mo. S. Ct. R. 74.06(b)(4).

279.     Defendant Maplewood is bound to follow the due process requirements issued by

the State of Missouri, including but not limited to, Missouri Rule of Civil Procedure 37.33,

which sets forth the procedural requirements for municipalities accusing individuals of ordinance

violations and therein specifies the required contents of a Violation Notice. Subsection (b) of

Rule 37.33 states:

> When a violation has been designated by the court to be within the
> authority of a violation bureau pursuant to Rule 37.49, the accused *shall
> also be provided* the following information:
>
> (3)  The specified fine and costs for the violation; and
> (4)  That a person must respond to the violation notice by:
>
> > (A) Paying the specified fine and court costs; or
> > (B) *Pleading not guilty and appearing at trial.*

Mo. R. Civ. P. 37.33(b) (emphasis added).

280.     As set forth above, Defendant Maplewood, pursuant to its policies and

procedures, withholds basic information about the fines costs assessed against Plaintiffs and

others similarly situated who cannot pay "Failure to Appear" warrant recall fees.

281.     Additionally, as set forth above, Defendant Maplewood, pursuant to its policies

and procedures, also denies Plaintiffs and others similarly situated from accessing its court for

purposes of pleading not guilty and appearing at trial where those individuals are unable to pay

the arbitrary warrant recall fees.

282.     Furthermore, as set forth above, Defendant Maplewood, pursuant to its policies

and procedures, refuses to issue new court appearance dates or to allow individuals to file any

motions related to their underlying citations or to their "Failure to Appear" citations until

Plaintiffs and others similarly situated either (1) pay the entire "warrant recall fee" or bond

amount associated with the "Failure to Appear" charge; or (2) turn themselves in to be arrested

and jailed for an indefinite period of time.

283.    Based on these denials of court access, it follows that Defendant Maplewood, pursuant to its policies and procedures, either (i) does not provide the accused *any* notice whatsoever when issuing "Failure to Appear" or "Failure to Pay" warrants and accompanying warrant recall or bond fees; or (ii) any notice Defendant Maplewood may send cannot possibly satisfy the requirements set forth in Rule 37.33(b), since Rule 37.33(b) requires the Defendant Maplewood to notify individuals of procedural rights Defendant Maplewood refuses to afford to Plaintiffs and others similarly situated. Either way, Defendant Maplewood's policies and procedures violate the due process requirements set forth in Rule 37.33(b), and should be declared void pursuant to Mo. S. Ct. Rule 74.06(b)(4).

## COUNT VII
### Unjust Enrichment

284.    The preceding paragraphs are incorporated herein by reference.

285.    The Plaintiffs and others similarly situated conferred a benefit upon Defendant Maplewood when they paid money to Defendant Maplewood pursuant to the Defendant's unlawful "warrant recall fee" or other pay-for-access policies and procedures.

286.    Furthermore, Defendant Maplewood appreciated the benefit conferred upon it by the Plaintiffs and others similarly situated when Defendant Maplewood deposited the money into their coffers for their own use, and the value of such benefit can be readily ascertained to be an amount equaling the face value of the monies paid to Defendant Maplewood, along with interest.

287.    As set forth above, Defendant Maplewood accepted payments from Plaintiffs and others similarly situated through unlawful, inequitable, and unconstitutional means.

288.    Thus, allowing Defendant Maplewood to retain these ill-gotten gains would

constitute an inequitable injustice whose only remedy is injunctive relief in the form of restitution of the monies the Plaintiffs and others similarly situated paid to Defendant Maplewood, along with an award of interest for the length of time during which Defendant Maplewood have appreciated and continue to appreciate the benefit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court issue the following relief:

a. Certification of the Declaratory and Injunctive Class and the Damages Classes, as defined above;

b. A declaratory judgment that Defendant violated, and continues to violate, Plaintiffs' First and Fourteenth Amendment rights by denying Plaintiffs access to the courts unless and until Plaintiffs pay or paid "warrant recall fees," "warrant bonds," or other monetary pay-for-access fees related to Plaintiffs' alleged "Failure to Appear" or "Failure to Pay" charges;

c. A declaratory judgment that Defendant violated, and continues to violate, Plaintiffs' Fourteenth Amendment due process and equal protection rights by imprisoning them for their inability to pay court fees and fines, including warrant recall fees, warrant bonds, or other pay-for-access fees without conducting any meaningful inquiry into those individuals' abilities to pay or into any alternatives to incarceration;

d. A declaratory judgment that Defendant violated, and continues to violate, Plaintiffs' rights under the Sixth and Fourteenth Amendments by imprisoning them without appointing adequate counsel at the proceedings that led to their incarceration;

e. A declaratory judgment that Defendant violated, and continues to violate, Plaintiffs' constitutional rights by holding them indefinitely and arbitrarily in jail without any valid legal process;

f. A declaratory judgment that Defendant violated, and continues to violate, Plaintiffs' Fourth and Fourteenth Amendment rights by issuing and serving arrest warrants without probable cause to believe that the elements of an offense had been committed, with unreasonable delay prior to presentment, and without providing pre-deprivation of liberty process where such process is easily available to the Defendant;

g. A declaratory judgment that Defendant violated, and continues to violate, Plaintiffs' due process rights set forth by Mo. R. Civ. P. 37.33(b) when it

failed to send proper Violation Notice to persons accused of "Failure to Appear" and/or "Failure to Pay" charges;

h.  An order and judgment declaring void all "Failure to Appear" and/or "Failure to Pay" judgments entered by Defendant's municipal court for failure of due process pursuant to Mo. S. Ct. R. 76.04(b)(4); along with an order and judgment against Defendant Maplewood to refund to Plaintiffs and all others similarly situated any and all fines, fees, warrant recall fees, bonds, and court costs received by Defendant pursuant to void "Failure to Appear" and/or "Failure to Pay" judgments;

i.  An order enjoining Defendant Maplewood to forgive any and all outstanding "Failure to Appear" fines or "warrant recall fees" that have been assessed but have not yet been collected; and further enjoining Defendant Maplewood from denying court access to any individuals for any reason whatsoever;

j.  An order and judgment in equity against Defendant Maplewood for restitution of all monies paid by Plaintiffs and others similarly situated pursuant to the unlawful conduct, policies, and procedures of Defendant Maplewood, along with an award of interest in favor of Plaintiffs and others similarly situated to compensate them for the period of time during which Defendant Maplewood retained the benefit of their ill-gotten gains;

k.  An order and judgment permanently enjoining Defendant from enforcing the above-described unconstitutional policies and practices against Plaintiffs and others similarly situated;

l.  A declaratory judgment that Defendant Maplewood violated the equal protection rights of Plaintiffs and others similarly situated by imposing harsh debt collection measures not imposed on debtors whose creditors are private entities;

m.  A judgment compensating the Plaintiffs and others similarly situated for the damages that they suffered as a result of Defendant's unconstitutional and unlawful conduct; and

n.  An order and judgment granting Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1595, and any other relief this Court deems just and proper.


Dated: November 1, 2016            Respectfully submitted,

                                   By: */s/ Thomas B. Harvey*
                                        Thomas B. Harvey (MBE #61734MO)

Michael-John Voss (MBE #61742MO)
Blake A. Strode (MBE #68422MO)
Nathaniel Carroll (MBE #67988MO)
Edward J. Hall (MBE #0012692IA)
ARCHCITY DEFENDERS, INC.
1210 Locust Street
Saint Louis, MO 63103
Tel:    (855) 724-2489
Fax:    (314) 925-1307
tharvey@archcitydefenders.org
mjvoss@archcitydefenders.org
bstrode@archcitydefenders.org
ncarroll@archcitydefenders.org
ehall@archcitydefenders.org

and      Jeffrey D. Kaliel (*pro hac application pending*)
Martin D. Quiñones (*pro hac application pending*)
TYCKO & ZAVAREEI LLP
1828 L Street, NW – Suite 1000
Washington, D.C. 20036
Tel:    (202) 973-0900
Fax:    (202) 973-0950
jkaliel@tzlegal.com
mquinones@tzlegal.com

*Attorneys for Plaintiffs*